Alain M. Baudry
**MASLON EDELMAN BORMAN & BRAND, LLP**
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone:  (612) 672-8200
Facsimile:   (612) 672-8397
E-mail:        alain.baudry@maslon.com
                     Jon.parritz@maslon.com
                     paul.civello@maslom.com

Michael J. LaVelle –  State Bar No. 002296
Matthew K. LaVelle –  State Bar No. 018828
**LAVELLE & LAVELLE, PLC**
2525 East Camelback Road, Suite 888
Phoenix, AZ 85016
Telephone:  (602) 279-2100
Facsimile:   (602) 279-2114
E-mail:        MJL@LaVelle-LaVelle.com
                     Matt@LaVelle-LaVelle.com

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE STATE OF ARIZONA**

| | |
|---|---|
| RONALD COVIN, BERNARD PATTERSON, ALLEN PATZKE and WALTER KRAUSE individually, on behalf of themselves and all others similarly situated,<br><br>                        Plaintiffs,<br><br>vs.<br><br>ROBERT W. BAIRD & CO., Inc., a Wisconsin corporation, M.L. STERN & CO., LLC, a California corporation, EDWARD JONES, L.P., a Missouri | **Case No.**<br><br>**Case Assigned To:**<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**(Jury Trial Demanded)** |

| | |
|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21 | limited partnership, THE INDUSTRIAL DEVELOPMENT AUTHORITY OF THE COUNTY OF YAVAPAI, a political subdivision of the State of Arizona, THE TOWN OF PRESCOTT VALLEY, a political subdivision of the State of Arizona, PRESCOTT VALLEY EVENT CENTER, LLC, an Arizona limited liability company, PRESCOTT VALLEY SIGNATURE ENTERTAINMENT, LLC, an Arizona limited liability company, GLOBAL ENTERTAINMENT CORP., a Nevada corporation, FAIN SIGNATURE GROUP, LLC, an Arizona limited liability company, KUTAK ROCK LLP, a Nebraska limited liability partnership, STINSON, MORRISON, HECKER LLP, a Missouri limited liability partnership, TL HOCKING & ASSOCIATES, LLC, an Arizona limited liability company, THOMAS L. HOCKING, W. JAMES TRELIVING, RICHARD KOZUBACK, KENNETH E. RENKEN AND H.W. SMITH, individuals,<br><br>                    Defendants. | |

Plaintiffs, by their attorneys, Maslon Edelman Borman & Brand, LLP and LaVelle & LaVelle, on behalf of themselves and on behalf of all similarly situated persons, for their Class Action Complaint against Defendants, and each of them, state and allege as follows.

**JURISDICTION AND VENUE**

1.     This Court has federal question jurisdiction pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

2.     Venue of this action lies in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and the property that is the subject of this action is located in this District.

**SUMMARY OF COMPLAINT**

3.     This action arises from the fraudulent offering and sale of $35 million in face value of what were misrepresented to be "A-" rated, investment grade excise tax revenue bonds ("Bonds") used to finance construction of a 5,000 seat event center in Prescott Valley, Arizona (the "Event Center").

4.     The Defendants, in connection with the offering and sale of this security, failed to disclose material factual information that indicated that the Event Center could not generate sufficient operating revenues and sales tax revenues to make the project economically feasible.  Plaintiffs, reasonably believing that they were buying investment grade securities, purchased the Bonds in reliance upon recommendations from their brokers in many cases employed by the Defendant underwriters and/or upon review of the prospectus called a "Preliminary Official Statement" dated November 4, 2005 and/or an "Official Statement" ("OS") dated

November 18, 2005 (collectively the "Official Statements") which omitted to disclose material facts.

5.      The key sources of revenue to pay debt service on the Bonds during the first year of operations were net operating revenues and transaction privilege taxes, which consisted of sales taxes generated by the Event Center; sales taxes generated in the "Entertainment District" adjacent to the Event Center, and sales taxes generated in a "Secondary Credit Support Area" located close to the Event Center but outside the Entertainment District.  The net operating revenues, sales taxes generated by the Event Center and sales taxes generated in the Entertainment District were highly dependent upon both the number of events held in the Event Center and attendance at those events.  Sales tax revenues generated in the Secondary Credit Support Area were dependent in part on expenditures made by people attending events at the Event Center.  Defendants fraudulently inflated the number of events and the attendance at the events in order to achieve revenues that could support an investment grade rating for the Bonds.

6.      In 2001, a detailed feasibility analysis was prepared for the City of Prescott (which is located about twelve miles from Prescott Valley and is in the same market area for an event center).  This study was based on the population and number of households in the market area and  concluded that an event center in this market area could reasonably be expected to attract about 78 events per year with

attendance of about 202,500 and generate net operating income of about $370,000. It was estimated that the event center would cost about $22 million to build and finance.  Prescott decided not to  build an event center.  The projections in the 2001 feasibility analysis was  reviewed  by  several  of  the  Defendants,  were materially inconsistent with the projections contained in the Official Statements and cast substantial doubt on the economic feasibility of the Event Center.

7.    A detailed  preliminary  feasibility  analysis  for  the  Prescott  Valley Event  Center  was  prepared  in  February  2005  by  an  independent  third  party Economics  Research  Associates  ("ERA").   This  preliminary  feasibility  analysis was  based  on  unaudited  financial  projects  for  the  Event  Center.   This  feasibility analysis  compared  the  population  and  household  base  in  the  market  area  for  the Event  Center  to  thirty-two  other  towns  in  the  United  States  having  comparable event  centers.   The  analysis  showed  that  the  population  base  and  number  of households  in  the  Prescott  Valley  market  area  were  extremely  low  compared  to  the average  population  and  number  of  households  in  the  thirty-two  comparable  market areas.   The  comparable  towns  had,  on  average,  three  to  four  times  the  population base  and  number  of  households  in  their  market  areas  than  were  located  in  the market  area  for  the  Event  Center.   These  important  material  facts  were  not disclosed  in  the  Official  Statements  when  the  Bonds  were  issued  in  November 2005.

8.     The projected cost of building and financing the Event Center increased dramatically between early 2004 (when serious consideration was first given to building the Event Center in Prescott Valley) and November 2005 when the Bonds were issued.  As the cost of constructing the Event Center and financing costs increased to $35 million, Defendants wrongfully increased the number of events, attendance at events and resulting operational revenues and sales tax revenues to offset increased cost of the Event Center.  The annual number of events was fraudulently inflated in the Official Statements from about 78 to 133 and estimated attendance was fraudulently inflated from 202,500 to 458,000.  As a result, projected sales taxes from the Event Center and Entertainment District were also inflated because they are directly impacted by Event Center revenues and attendance.

9.     Defendants also failed to disclose in the Official Statements the decision by certain of the Defendants to terminate ERA's participation, the independent third party who prepared the 2005 Preliminary feasibility report rather than have that party review the new, artificially inflated projections in the official statements that were prepared in response to the increasing costs of financing the Event Center.

10.    Each of the Defendants either directly participated in making the misleading statements in the Official Statements or was a controlling person with respect to such Defendants.

11.    The Event Center failed to break even from an operational standpoint (much less generate $1.6 million in net revenue available to pay debt service), failed to generate more than 70 events per year, and failed to obtain paying attendance remotely close to the inflated projections in the Official Statements.  As a result, sales tax revenue from the Event Center and Entertainment District fell far short of what was necessary to pay debt service on the Bonds.   The actual performance of the Event Center was actually close to the projections made for the City of Prescott in 2001.  The Event Center was never worth anywhere close to $35 million and is expected to never generate any meaningful net operating revenues.

**PARTIES**

12.    Plaintiff Ronald Covin is a resident of North Augusta, South Carolina. Covin is a retiree who purchased $10,000 in Bonds from his broker at Defendant M.L. Stern & Co. in January, 2006 based upon the broker's recommendation that the Bonds were a safe, investment grade A- rated security.

13.    Plaintiff Bernard Patterson is a resident of Prescott Valley, Arizona. He is a retiree who purchased $10,000 in Bonds from his broker at Defendant

Edward Jones, L.P. in November, 2005.  Patterson purchased the Bonds in reliance on the recommendation of his broker that they were a safe, investment grade A-rated security.

14.    Plaintiff Allen Patzke is a resident of Green Valley, Arizona.  He is a retiree who purchased $10,000 in Bonds based upon the recommendation of his broker at Defendant Edward Jones, L.P. in November, 2005.  Patzke relied on the recommendation of his broker that the Bonds represented a safe investment grade A- rated security.

15.    Plaintiff Walter Krause is a resident of Hugo, Minnesota.  He is a retiree who purchased $10,000 in Bonds from his broker at Defendant Edward Jones, L.P. in November, 2005.  He relied on the recommendation of his broker that the Bonds were a safe, investment grade A-rated security.

16.    Plaintiffs bring this action on their own behalf and as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of all persons who or which purchased the Bonds following their issuance in November 2005 through October 31, 2006 (the "Class Period").  Excluded from the Class are the defendants herein, members of each Individual Defendant's immediate family, any entity in which any defendant has a controlling interest, and the legal affiliates, representatives, heirs, controlling

persons, successors and predecessors in interest or assigns of any such excluded party.

17.     Because Defendants sold the Bonds directly or indirectly to over two hundred retail bondholders in numerous states, members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members can only be determined by appropriate discovery, plaintiff believes that Class members number at least over two hundred and that they are geographically dispersed.

18.     Plaintiffs' claims are typical of the claims of the members of the Class, because plaintiffs and all of the Class members sustained damages arising out of defendants' wrongful conduct complained of herein and the Plaintiffs and the Class were induced to purchase the Bonds as a result of Defendants' failure to disclose material facts in the Official Statements.

19.     Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel who are experienced and competent in class and securities litigation.  Plaintiffs have no interests that are contrary to or in conflict with the members of the Class who Plaintiffs seek to represent.

20.     A class action is superior to all other viable methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the

Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class individually to redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

21.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

a.    did each Defendants knowingly and/or recklessly have knowledge of the dissemination of the Official Statements and their failure to disclose material facts?

b.    did Defendants in connection with the purchase or sale of the Bonds employ a device, scheme or artifice to defraud?

c.    did each Defendant in connection with the purchase or sale of the Bonds engage in any act, practice or course of business which operated or would operate as a fraud  or deceit upon buyers of the bonds?

d.    did the omissions result in the Bonds erroneously being given an investment grade rating by a ratings agency which rated the Bonds?

e.    was the investment grade rating of the bonds an important factor in the decision of individual Bondholders to purchase the bonds?.

f.    were Bondholders' damaged by the Defendants' failure to disclose material facts in the Official Statements?

22.     Defendant Robert W. Baird & Co. ("Baird"), is a Wisconsin corporation that, at all times pertinent to this Complaint, maintained its principal place of business in Wisconsin.  Baird acted as the lead underwriter in connection with the issuance of the Bonds, was one of the principal authors of the Official Statements, and failed to disclose numerous material facts.  As an underwriter, Baird, through its brokers, offered the Bonds to members of the Class.

23.     Defendant M.L. Stern & Co., LLC ("Stern"), is a California limited liability company that, at all times pertinent to this Complaint, maintained its principal place of business in California.  Stern acted as the lead underwriter in connection with the issuance of the Bonds until it was replaced as lead underwriter by Baird.  Stern was one of the principal authors of the Official Statements.  Stern failed to disclose material facts in the Official Statements.  As an underwriter, Stern, through its broker, offered the Bonds to Plaintiff Covin and other members of the Class.

24.     Defendant Edward Jones ("Jones") is a Missouri corporation that, at all times pertinent to this Complaint, maintained its principal place of business in Missouri.  Jones acted as an underwriter in connection with the issuance of the Bonds and was one of the principal authors of the Official Statements.  Jones failed to disclose material facts in the Official Statement.  As an underwriter, Jones,

through its brokers, offered the Bonds to Plaintiffs Patterson, Patzke, Krause and other members of the Class.

25.     Defendant Prescott Valley Event Center, LLC ("PVEC") is an Arizona limited liability company that, at all times pertinent to this Complaint, maintained its principal place of business in Arizona.  The members of PVEC were Defendants Prescott Valley Signature Entertainment, LLC and Global Entertainment Corporation.  PVEC was the principal development entity for the Prescott Valley Event Center.  PVEC, through its principals, PVSE and Global, participated in the process of drafting the Official Statements, provided much of the information contained in the Official Statements to the underwriters and failed to disclose numerous material facts.

26.     Defendant Prescott Valley Signature Entertainment, LLC ("PVSE") is an Arizona limited liability company that, at all times pertinent to this Complaint, maintained its principal place of business in Arizona.  PVSE was a member and controlling person of PVEC.  The sole member of PVSE was Fain Signature Group, LLC.

27.     Defendant Fain Signature Group, LLC ("Fain Group") is an Arizona limited liability company that, at all times pertinent to this Complaint, maintained its principal place of business in Arizona.  Fain Group was the sole member and controlling person of PVSE.  Fain Group is owned by the Fain family, which has

significant commercial real estate holdings in Prescott Valley, and which expected that the value of its real estate holdings in Prescott Valley would be significantly enhanced by construction of the Event Center.  PVSE and Fain Group are referred to collectively as the "Fain Group."

28.    The Fain Group participated in the process of drafting the Official Statements, provided much of the information contained in the Official Statements to the underwriters and failed to disclose numerous material facts.

29.    Defendant Global Entertainment Corporation ("Global") is a Nevada corporation that, at all times pertinent to this Complaint, maintained its principal place of business in Arizona.  Global was, at all times pertinent to this Complaint, engaged in the business of, among other things, promoting, financing, building, operating and developing small to mid-size event centers.  Global participated in the process of drafting the Official Statements, provided much of the information contained in the Official Statements to the underwriters and failed to disclose numerous material facts.  Global was a member and controlling person of PVEC. As alleged in more detail below, Global sometimes acted through its corporate affiliate, International Coliseums Company ("ICC").

30.    Defendant W. James Treliving is a resident of the state of Texas and, at all times pertinent to this Complaint, acted as the chairman of the Board of

Directors of Global.  At all times pertinent to this Complaint, Treliving was a controlling person of Global and PVEC.

31.    Defendant Richard Kozuback is a resident of the state of Arizona.  At all times pertinent to this Complaint, Kozuback was the president and Chief Executive Officer of Global.  At all times pertinent to this Complaint, Kozuback was also a Director of Global.  Kozuback was a controlling person of Global and PVEC.

32.    Defendant The Industrial Development Authority of the County of Yavapai (the "Authority"), is a political subdivision of the State of Arizona and was the issuer of the Bonds.  As the issuer of the Bonds, the Authority offered the Bonds to the investing public, including Plaintiffs and the Class, during the initial public distribution.  The Authority failed to disclose numerous material facts in the Official Statement.

33.    Defendant Town of Prescott Valley (the "Town" or "Prescott Valley") is a political subdivision of the State of Arizona that participated in the process of underwriting the Bonds.  The Town agreed to pledge certain sales tax revenues towards repayment of the Bonds.  The Town indirectly acquired ownership of the Event Center through a Community Facilities District it established.  The Town knew that the Official Statements failed to disclose numerous material facts.

34.     Defendant Kutak Rock LLP ("Kutak Law Firm") is a Nebraska limited liability partnership that, at all times pertinent to this Complaint, maintained its principal place of business in Nebraska and maintained an office in Arizona staffed with attorneys licensed to practice law in Arizona.  The Kutak Law Firm is experienced in municipal bond law and often acts as bond counsel or underwriters counsel for municipal bond offerings.  The Kutak Law Firm acted as bond counsel in connection with the issuance of the Bonds and was a principal author of the misleading Official Statements.  The Kutak Law Firm had reason to believe the Official Statements omitted numerous material facts and recklessly failed to take corrective action.

35.     Defendant Stinson, Morrison, Hecker LLP ("Stinson Law Firm") is a Missouri limited liability partnership that, at all times pertinent to this Complaint, maintained its principal place of business in Missouri and maintained an office in Nebraska staffed with attorneys licensed to practice law in Nebraska.  The Stinson Law Firm is experienced in municipal bond law and acted as underwriter's counsel in connection with the issuance of the Bonds.  The Stinson Law Firm was a principal author of the misleading Official Statements.  The Stinson Law Firm had reason to believe the Official Statements omitted numerous material facts and recklessly failed to take corrective action.

36.    Thomas L. Hocking is a former investment banker with substantial experience in municipal bond financing.   Hocking formed and, at all times pertinent to this Complaint, did business through Defendant TL Hocking Associates, LLC (collectively "Hocking"). Defendant TL Hocking Associates is an Arizona limited liability company that, at all times pertinent to this complaint, maintained its principal place of business in Arizona.  Hocking was a controlling person of TL Hocking Associates, LLC.   Hocking partnered with Global to promote the development of event centers and failed to disclose numerous material facts in the Official Statements.

## GENERAL ALLEGATIONS

## GLOBAL AND ICC SOLICIT THE CITY OF PRESCOTT TO CONSTRUCT AN EVENT CENTER

37.    Global is a holding company established in April 2000 through a reverse merger with the Western Professional Hockey League, Inc.  In June 2001 Global negotiated a Joint Operating Agreement with the Central Hockey League ("CHL") and fielded sixteen teams using the CHL name.   In November 2002 Global acquired International Coliseums Company ("ICC") which was in the business of designing, managing and operating multi-purpose event centers. According to Global (Official Statements p. 27), this vertical integration provided Global with, "the expertise to develop, design, build and manage multi-purpose event centers."   Global also arranges the financing of event centers. At all times

pertinent to this Complaint, Global was directly and indirectly controlled by its officers and directors, including Treliving and Kozuback.

38.    Global and Hocking seek to persuade communities that are not large enough to attract major league professional sports franchises to build event centers that will be anchored by a CHL hockey team or other minor league sports teams. Global offers to develop, arrange financing, build and operate the event center.

39.    Revenues from event centers are derived from the annual number of events and the number of people who pay to attend those events.  Net operating revenues from event centers are a function of project revenues less operating expenses.  The amount of attendance at events depends primarily on the population and number of households in the market area for the event center and disposable income.  The annual number of events an event center can attract also depends upon the population and number of households in the market area.  The amount of sales tax revenues generated by an event center and surrounding businesses is also dependent upon the population and number of households in the market area.  The economic feasibility of an event center that uses both operating revenues and sales tax revenues to service the debt incurred building the event center is highly dependent upon the surrounding population and the level of disposable income.

40.    Between 2001 and 2003, Prescott, Global and the affiliate it acquired in 2002, ICC, were engaged in discussions with the City of Prescott ("Prescott")

regarding the proposed construction of an event center that would host a minor league hockey team.  Prescott is located about twelve miles from Prescott Valley and is in the same market area as Prescott Valley.

41.     On November 15, 2001, ICC prepared a Feasibility Report and Needs Analysis ("2001 Feasibility Report") for Prescott that addressed the construction and financing of an event center with a seating capacity of between 3,500 and 5,000 at a cost not to exceed $22 million dollars.  The 2001 Feasibility Report recognized that two important factors in projecting the number of events and attendance that such a center could support were "demographics" and "disposable income."

42.     The 2001 Feasibility Report projected first year gross revenues of $1.7 million in recognition that the population in the surrounding market area would support no more than 78 events per year and achieve total first year attendance of 202,500.

43.     In contrast, by the time the Bonds were issued in November 2005, Global prepared projections for the Official Statements indicating that the Prescott Valley Event Center (which was of comparable size, was in the same market area and had the same overall population base as Prescott) could reasonably be expected to generate $5.8 million dollars in first year revenues (more than 300% higher than the 2001 Feasibility Report), could host 133 events (more than 90%

higher than the 2001 Feasibility Report) and achieve first year attendance of 486,000 (240% higher than the 2001 Feasibility Report).

**GLOBAL AND HOCKING MARKET THE EVENT CENTER TO THE TOWN IN 2004 AND FORM A JOINT VENTURE WITH THE FAIN GROUP**

44.      Global and Hocking approached Prescott Valley in 2004 and proposed construction of a similar event center that would host a minor league hockey team and would be financed through the sale of municipal bonds.  Global's proposal entailed establishing a CHL hockey team in Prescott Valley (now the Arizona Sundogs) that would play in a 5,000 seat event center (the "Event Center") that would be constructed and managed by Global.  Global proposed to build the Event Center on a 33-acre parcel owned by the Fain family located adjacent to a previously established the initial "Entertainment District."  Global and the Fain Group formed PVEC to promote the Event Center and cause it to be financed with municipal revenue bonds.  As of May 2004, these Defendants estimated it would cost approximately $19 million to build the Event Center.

45.      Prescott rejected the proposal to construct an event center in Prescott as contemplated by the 2001 Feasibility Report.

46.      Global acquired ICC in 2002, obtained a copy of the 2001 Feasibility Report and provided it to Hocking, the Town and the Fain Group, each of whom reviewed it before the Bonds were issued in November 2005.

47.   The Fain Group agreed to provide the Town with land on which the Event Center would be constructed and to cooperate with the Town to create a financing mechanism for the project.  Global agreed to design and build the Event Center, to provide a minor league hockey team as anchor tenant, to enter into an agreement to manage and operate the Event Center and secure all contractually obligated revenue streams for the Event Center.  The Town agreed to create a Community Facilities District to own the Event Center and to cooperate in the development and preparation of the financing structure, sources of pledged revenues and public offering disclosure documents.

48.   Global, the Fain Group and the Town each had a significant financial interest in financing the Event Center with municipal revenue bonds.  Global would be compensated for managing the Event Center and would obtain the financial benefit of expanding the CHL with a new hockey team.  The Fain Group had substantial landholdings within the Entertainment District adjacent to the Event Center and otherwise had substantial landholdings in and around Prescott Valley.  The Fain Group had the opportunity to achieve increased land values, higher rental rates and higher rebates of sales tax revenues from the Town if an Event Center was built adjacent to the existing Entertainment District.  The Town had the opportunity to benefit from substantially increased sales tax revenues.

**THE PARTICIPANTS QUICKLY REALIZED THE IMPORTANCE OF AN INVESTMENT GRADE RATING**

49.     It was critical to Global, the Fain Group and the Town that the Bonds receive an investment grade rating.  Such a rating would permit the Bonds to be marketed to a much broader segment of investors and allow them to be issued at the lowest possible interest rate.  The Town, Global and the Fain Group quickly concluded that without an investment grade rating it would be extremely difficult, if not impossible, to finance construction of the Event Center.

50.     In May 2004 Town representatives were advised by Global that in order to obtain an investment grade rating from a rating agency, it would be necessary to demonstrate total net cash flows of at least two times the amount of annual debt service.

51.     A working group consisting of Global, Brad Fain, Hocking and representatives from the Town began meeting to develop a financing plan that would provide the requisite level of cash flows to qualify for an investment grade rating.  These Defendants recognized that, in order to obtain an investment grade rating, debt service would have to be funded by both net operating revenues from the Event Center and other sources, including pledged sales tax revenues.  Global began generating projections in an effort to achieve investment grade cash flow.

52.     In September 2004, the Town, Fain Group, and Global generated a "preliminary and tentative term sheet" for construction of a 4,000 seat event center

to be financed through a $23.8 million bond issue.  As alleged in more detail below, because financing costs ballooned to $35 million and the interest rate increased, Global and Hocking, with the knowledge, consent and participation of the Town and the Fain Group, decided to artificially and wrongfully inflate projections so that they would generate the projected levels of revenues and sales taxes needed to obtain an investment grade rating, even though they lacked a reasonable basis to do so.

**THE TOWN RETAINS A FINANCIAL ADVISOR AND TOGETHER WITH THE FAIN GROUP AND GLOBAL RETAIN AN INDEPENDENT CONSULTANT TO PREPARE A FEASIBILITY REPORT**

53.     In late 2004 the Town retained its own independent financial advisor, the broker-dealer and investment banking firm Stone & Youngberg, LLC ("S&Y"), to assist in the development of a financing structure for the Event Center.

54.     In December 2004, S&Y, the Town, the Fain Group and Global unanimously agreed that it was appropriate to have an independent consultant address the financial feasibility of the Event Center and examine Global's projections.  They solicited a proposal from ERA, which was based in Los Angeles, California.

55.     ERA provided a written proposal for a three phase analysis:  1) preparation of a preliminary Feasibility Report; 2) analysis of the sales tax revenues that could be used to fund revenue shortfalls; and 3) an "examination

report" to be prepared at a later date that could be attached to the Official Statements for the Bonds and would specifically opine that the financial forecasts in the Official Statements were within applicable guidelines and that the underlying assumptions provided a reasonable basis for its forecast. ERA stated that, in the event the participants proceeded with a bond financing, it would be necessary for ERA to update, revise or otherwise finalize the preliminary Feasibility Report and anticipated that only a final report, issued as part of a Phase 3 examination, would be included in the Bond offering documents.

56.     On December 31, 2004, the Town, Fain Group, Global accepted ERA's three phase proposal and signed an engagement letter. ERA indicated it would charge $ 45,500 for Phases 1 and 2 and $ 33,000 for Phase 3. The Town, Fain Group and Global agreed to equally split the cost.

**ERA ISSUES A PRELIMINARY FEASIBILITY REPORT IN FEBRUARY 2005**

57.     ERA issued a 97-page preliminary feasibility report, with appendices, in February 2005 ("2005 Preliminary Feasibility Report"). As contemplated in ERA's proposal, the 2005 Preliminary Feasibility Report contained the first two phases of the proposed feasibility analysis but did not include the "examination report." The 2005 Preliminary Feasibility Report assumed the Event Center would be a 4,500 to 5,000 seat arena located in Prescott Valley and was based upon cash flow projections prepared by Global.

58.     The table below highlights the differences among the projections for first year number of events, attendance and revenue projections in the 2001 Feasibility Report, the 2005 Preliminary Feasibility Report and the 2005 OS:

|  | **2001 Feasibility Report** | **2005 Preliminary Feasibility Report** | **2005 Official Statement** |
|---|---|---|---|
| **No. of Events** | 78 | 103 | 133 |
| **First Year Attendance** | 202,500 | 321,170 | 480,000 |
| **First Year Gross Revenue** | $1.59 million | $4.5 million | $5.84 million |
| **Project Costs** | $22 million | $25 | $35 million |

59.     The base case cash flow presented in the 2005 Preliminary Feasibility Report projected 103 events annually and total first year paid attendance of 321,000.  In contrast, the 2001 Feasibility Report prepared by Global's affiliate, ICC, projected 78 events and total first year paid attendance of 202,500.  As alleged in more detail below, Global's projection of 133 events per year in November 2005 (a 29% increase over the ERA report and a 71% increase over the 2001 Feasibility Report) was created to show higher revenues but had no legitimate basis.  In the Official Statement, Global also projected total first year paid attendance of 480,000 (a 50% increase over the ERA number and a 137% increase over the 2001 Feasibility Report) again to increase revenues but without any legitimate justification.

60.     The "base case" cash flow in the 2005 Preliminary Feasibility Report projected yearly revenues of $4.5 million in year one growing to $4.7 million in year five.  The Official Statements projected first year revenues of $5.8 million, growing to $6.2 million in year five (on average thirty percent higher than the revenue projections in the 2005 Preliminary Feasibility Report) without any legitimate justification.

61.     The wrongfully inflated event, attendance and gross revenue projections in the Official Statements were intended to offset the substantially increased financing and construction costs and did not have a reasonable basis in fact.   The dramatic increase in projected events and attendance also allowed Defendants to substantially increase projected revenues from parking and Event Center sales taxes ensuring that the necessary multiples of cash flows needed for an investment grade rating could be demonstrated.

**THE 2005 PRELIMINARY FEASIBILITY REPORT COMPARED THE POPULATION AND NUMBER OF HOUSEHOLDS IN THE PRESCOTT VALLEY MARKET AREA TO THIRTY-TWO OTHER MARKET AREAS**

62.     The 2005 Preliminary Feasibility Report contained significant comparative factual information that showed the increased events, attendance and revenue projections in the Official Statements were not reasonable.  To provide a meaningful basis for evaluating the financial feasibility of the Event Center, ERA provided significant demographic information for comparable arenas located in the

United States.  This factual information was critical to evaluation of the Global projections but was not disclosed in the Official Statements.

63.    The 2005 Preliminary Feasibility Report placed the population and household level in Prescott Valley in context by comparing the demographics of Prescott Valley to other cities with CHL franchises:

> [I]n comparing the Prescott Valley demographics to the other franchises within the CHL (comparison within a 15-mile radius of the respective arenas), the Town of Prescott Valley ranks below the average in population (64,300 to 408,000), in number of households (26,000 to 155,000); and in household incomes (40,000 to 43,000).  It should be noted that some of the CHL markets have more than one sports franchise to support in their local area.

As of early 2005, the average population within a 15-mile radius of the arena for Central Hockey League franchises was 6.35 times greater than the population in Prescott Valley and the surrounding area.  This material fact was not disclosed in the Official Statements and was intentionally concealed from Bond purchasers.

64.    Table 3-12 to the 2005 Preliminary Feasibility Report accurately reported population and household statistics for seventeen existing CHL markets.  The average population of the seventeen CHL markets (excluding the high and lowest locales) was 382,971 compared to the Prescott Valley population of 98,425.  Based on Table 3-12 (which counted the number of households within a 15 mile radius), the 2005 Preliminary Feasibility Report accurately stated the following facts:

"[T]he average number of households among CHL franchise market areas is approximately 155,000.  Excluding the high and low number of households, the average becomes 145,600.  In comparison, Prescott Valley has a total of only 41,000 households."

As of early 2005, the average number of households within a fifteen mile radius of the arena for CHL franchises was 3.5 times greater than the number of households in Prescott Valley. This material fact was not disclosed in the Official Statements and was intentionally concealed from Bond purchasers.

65.    The 2005 Preliminary Feasibility Report assumed the Arena Football 2 League ("AF2") was a possible second anchor tenant for the Event Center.  The 2005 Preliminary Feasibility Report set forth the population, household and median household income statistics for twenty towns hosting AF2 teams as of 2003 in Table 3-13 (p. 32).    Table 3-13 accurately reported the 2003 average population of the twenty AF2 markets at 474,279 and accurately reported the average population excluding the high and low populations as 440,924.  The 2005 Preliminary Feasibility Report (p. 31) accurately stated that, "the average population for each of the AF2 market areas is approximately 474,000" and, "taking out the markets with the highest and lowest population levels, the average population was just over 440,000."   The 2005 Preliminary Feasibility Report accurately stated that, "in comparison, Prescott Valley's population is significantly lower at just over 98,400."   As of early, 2005, the average population of towns hosting AF2 teams was 4.5 times greater than the population of Prescott Valley.

This material fact was not disclosed in the Official Statements and was intentionally concealed from Bond purchasers.

66.    The 2005 Preliminary Feasibility Report also evaluated seating inventory for existing event centers in various cities compared to population.  Five of the twenty AF2 markets were the same market areas reported with respect to CHL markets (Amarillo, Texas; Memphis, Tennessee; Oklahoma City, Oklahoma; Hidalgo, Texas; and Albany, Georgia).  Fifteen of the AF2 markets did not have a CHL team.  The 2005 Preliminary Feasibility Report identified thirty-two separate market areas with comparable mid-sized event centers that, on average, were at least three times larger than the Prescott Valley market area.  This material fact was not disclosed in the Official Statements and was intentionally concealed from bondholders.

67.    Using Global's inflated "base case" projections, Table 8-7 in the 2005 Preliminary Feasibility Report demonstrated that positive debt service coverage necessary to achieve an investment grade rating could only be achieved if a significant percentage of sales taxes from the Event Center and the Entertainment District adjacent to the Event Center were pledged to pay debt service.

**THE FAIN GROUP, GLOBAL, HOCKING AND THE TOWN AGREE TO FIRE ERA AND DISPENSE WITH THE AGREED UPON PHASE 3 FEASIBILITY EXAMINATION**

68.     Following preparation of the 2005 Preliminary Feasibility Report, Hocking, the Town, Global and the Fain Group learned that it would cost substantially more to construct the Event Center than they had previously estimated, resulting in the need for a much larger bond issuance than anticipated. Due to the increased costs, Global, Hocking and the Fain Group recognized the need to inflate the projections in the 2005 Preliminary Feasibility Report. This would obviously require the approval of ERA, which they believed could not be obtained. Consequently, the Fain Group, Hocking and Global chose to fire ERA rather than spend another $33,000 and proceed with Phase 3 analysis that would have demonstrated the project was not financially feasible at a $ 35 million dollar level.

69.     The Town's investment advisor, S&Y, strongly disagreed with this course of action.  On May 1, 2005, S&Y recommended that the Town "insist on a Phase 3 Study being completed [by ERA] as a condition subsequent and that feasibility must be proved by the report ... at the very least to confirm Hocking's assertions and assumptions."

70.     The Fain Group, Hocking and Global claimed that, because the Town did not want to assume any economic risk in the transaction, it did not have the

right to ascertain the merits of the private financing being arranged by them to finance the arena.   S&Y advised the Town not to accede to this ultimatum, commenting that "[t]he Town's right and ability to ascertain the merits of the private financing has already been agreed to by the parties and is fair based upon the Town's potential liability."

71.     In light of the decision to fire ERA, the Town was concerned about potential liability to purchasers of the Bonds and sought indemnification from other participants, including the Fain Group, for any liability relating to the Event Center financing.   The Town also sought to include provisos in a Development Agreement (which the parties anticipated would be attached to the Official Statements), stating that a Phase 3 Feasibility Report was necessary. In particular, the Town demanded a "proviso X" in the Development Agreement stating that "the Town's financial advisors have advised that the Town no longer directly participate in the [Event Center] Financing determinations based on the decision by Fain and [Global] not to pursue Phase 3 of the ERA Feasibility Study."

72.     On May 2, 2005, counsel for the Fain Group criticized the Town's requests for a statement of the need for a Phase 3 Feasibility Report in the recitals to the Development Agreement as "overkill and coming dangerously close to telling potential lenders that the Town affirmatively has no faith in the process."

73.   The Town continued to demand language in the Development Agreement stating that a Phase 3 Feasibility Study was required.  It demanded language in "Proviso O" to the Development Agreement that "in accordance with the original agreement by the Town, Fain and [Global] to participate the [ERA] Feasibility Study indicated that any determination to proceed with financing the [Event Center] would require a Phase 3 update or revision by [ERA] and the Town should require the Phase 3 study be done as a condition subsequent and the Phase 3 Study must prove feasibility."

74.   Global, Hocking and the Fain Group flatly rejected the Town's demands for a Phase 3 Feasibility Report and any statement of the need for such a report in the recitals to the Development Agreement. The Town's requested "Proviso X" stating that it had been advised to no longer directly participate in the financing was ignored entirely.  Instead, Proviso X of the Development Agreement merely provides:  "Whereas the Town is supportive of the Developer's efforts to develop and construct a public facility, which will enhance the Town's Tourism and visitor economic base…"

75.   The Town's request for language in Proviso O about the need for a Phase 3 Feasibility Study was likewise not included. Instead, the only reference to the 2005 Preliminary Feasibility Report in the Development Agreement was in "Proviso O," which stated:

WHEREAS, on February 24, 2005, SFCERA submitted the SFCERA Feasibility Study to the Town Council.  The Study included Phases 1 and 2 and indicated that the PVCEC would not be self-supporting but could potentially develop sufficient event-based revenues from which it could largely be financed and operated, with the assistance of certain Town, Fain and Developer revenues and other assistance.  If necessary, the SFCERA Feasibility Study will be updated and finalized by SFCERA to assist with financing the PVCEC.

76.     The final Development Agreement containing the above-quoted language was attached to the Official Statements in November 2005.  The Official Statements were misleading due to the failure to disclose the original agreement in which the Town, the Fain Group and Global all agreed that a Phase 3 Feasibility Examination was necessary, and their subsequent firing of ERA due to their belief that ERA would not approve the inflated projections in the Official Statements.

**S&Y WITHDRAWS FROM THE ENGAGEMENT BECAUSE OF THE REFUSAL OF GLOBAL, THE FAIN GROUP AND THE TOWN TO OBTAIN A PHASE 3 FEASIBILITY EXAMINATION**

77.     As the Town's investment advisor, S&Y continued to recommend that the Town: "insist on a Phase 3 Study being completed [by ERA] as a condition subsequent and that feasibility must be proved by the report . . . at the very least to confirm Hocking's assertions and assumptions."  Despite this recommendation and its previous demands, the Town acquiesced in the decision to fire ERA and not to obtain an independent Phase 3 Feasibility examination of the newly inflated projections.

78.    S&Y strongly disagreed with this course of action and refused to have further involvement in the project.  S&Y reminded the parties, in writing, of the need for a Phase 3 examination level report.  In a May 18, 2009 withdrawal letter to the Town, Global and Fain Group, S&Y stated:

> "It should also be noted that the Agreement contemplated that if the parties determined to proceed with the development and financing of the multi-purpose event center ("MPEC") it would be necessary to have a Phase 3 or Examination Report prepared.  S&Y continues to believe this report is warranted and advises that such a Phase 3 or Examination Report be prepared."

79.    The original agreement to obtain a Phase 3 "Examination Report," the subsequent dispute over the need for a Phase 3 "Examination Report," S&Y's insistence such a report be prepared and the decision of S&Y to withdraw from the project because of the refusal of the Fain Group, Global and the Town to obtain such a report were not disclosed to Bond purchasers in the Official Statements.

**GLOBAL, HOCKING AND THE FAIN GROUP WRONGFULLY INFLATE PLEDGED SALES TAX REVENUES BECAUSE THE COST OF THE BOND OFFERING INCREASED TO $ 35 MILLION**

80.    The Town and the Fain Group agreed that the Town would pledge 1% out of its 2.33% share of general sales taxes derived from the Entertainment District and the Fain Group would contribute its 1% share of the Town's 2.33% share of sales taxes from the Entertainment District (which the Town was contractually obligated to rebate to the Fain Group or its affiliates under the terms of a February 2000 Development Agreement) towards repayment of the Bonds.  To

demonstrate that annual revenues would be sufficient to cover debt service on the Bonds at least two times, the Town further agreed in principal to contribute 2% (out of 2.33%) of the sales taxes derived from businesses in a new "Secondary Credit Support Area" located outside the Entertainment District, but near the Event Center.

81.   In total, the Town and  the Fain Group and Global agreed to pledge sales tax revenues from the following four sources:

     a.   Event Center sales tax revenues (2 percent out of 2.33%) on ticket sales and other taxable transactions (e.g. food, merchandise parking). This pledge was anticipated to be non-contingent and was to be paid automatically regardless of whether or not there was a shortfall in debt service.

     b.   The Fain 1% share of the Town's 2.33% share of the Entertainment District tax (contingent on a shortfall in revenue to pay debt service).

     c.   The Town's 1% share of the 2.33% Entertainment District Tax (contingent on a shortfall in revenue to pay debt service).

     d.   The Town's 2% share of the 2.33% taxes from a defined Secondary Credit Support Area located adjacent to the Event Center but outside the Entertainment District (contingent on a shortfall in revenue to pay debt service).

The Secondary Credit Support Payments were initially capped at $ 1.4 million. The cap was later removed to persuade the bond rating agency to give the Bonds an investment grade rating.

82.    In May 2005 it was anticipated that it would cost between $22 and $27 million dollars to finance the Event Center.  By mid June 2005, the total cost of the financing had increased to as much as $35 million.

83.    The February 2005 Preliminary Feasibility Report analyzed potential sources of sales tax revenues which could be pledged to debt service, including the sales taxes from the Event Center, together with both the Fain Group and the Town's 1% share of sales taxes generated from the existing,  known and expected businesses in the "Entertainment District" adjacent to the Event Center.   In projecting these sales taxes, the 2005 Preliminary Feasibility Report assumed that Prescott Valley "would undergo significant development in the near future."   It assumed the creation of a four new restaurants and the additional development of 24,500 square feet of businesses within the Entertainment District.    The Preliminary 2005 Feasibility Study also assumed a "dramatic increase in housing inventory" in Prescott Valley which would bring additional residents to the Town. The Preliminary 2005 Feasibility Report assumed very optimistic growth scenarios for the Town resulting in a population increase of 5,338 (a 20% increase) between 2005 and 2008.

84.    Based on these anticipated population increases and new additional businesses, the 2005 Preliminary Feasibility Report (p. 95) projected sales tax revenues from the Event Center in years one through five.   These projected

smd

revenues are compared to the November 2005 Official Statements in the following table:

| Year | 2005 ERA | Official Statements | Δ | % Change |
|---|---|---|---|---|
| 1 | $ 145,000 | $ 219,392 | $ 74,392 | 51.30% |
| 2 | $ 148,000 | $ 222,683 | $ 74,683 | 50.46% |
| 3 | $ 148,000 | $ 226,023 | $ 78,023 | 52.72% |
| 4 | $ 156,000 | $ 229,413 | $ 73,413 | 47.06% |
| 5 | $ 155,000 | $ 232,855 | $ 77,855 | 50.23% |
| **Total** | **$ 752,000** | **$ 1,130,366** | **$ 378,366** | **51.00%** |

85.    The projections of sales tax revenue from the Event Center in the 2005 Preliminary Feasibility Report demonstrated that the sources of pledged sales taxes were insufficient to achieve an investment grade rating at the $25 million bond issuance level contemplated by the 2005 Preliminary Feasibility Report. When the cost of the bond issuance increased to $35 million, Global, Hocking and the Fain Group wrongfully inflated the amount of projected sales tax revenues from the Event Center to the above-referenced amounts in the Official Statements.

86.    The Fain Group, Global, Hocking and the Town also decided to wrongfully inflate the projected pledged sales tax revenues from the Entertainment District above the amounts projected in the 2005 Preliminary Feasibility Report as illustrated by the following table:

| Year | 2005 ERA | Official Statements | Δ | % Change |
|---|---|---|---|---|
| 1 | $ 570,000 | $ 654,849 | $ 84,849 | 14.89% |
| 2 | $ 710,000 | $ 822,158 | $ 112,158 | 15.79% |

| | | | |
|---|---|---|---|
| 3 | $   852,000 | $   989,919 | $   137,919 | 16.19% |
| 4 | $   998,000 | $ 1,158,146 | $   160,146 | 16.05% |
| 5 | $ 1,148,000 | $ 1,326,853 | $   178,853 | 15.58% |
| **Total** | **$ 4,278,000** | **$ 4,951,925** | **$   673,925** | **16.00%** |

87.    No reasonable basis existed for the increase in projected Entertainment District taxes and Event Center sales taxes over and above the projected levels in the 2005 Preliminary Feasibility Report, which already assumed extremely robust growth.  The Official Statements failed to disclose the materially different projected pledged tax revenues in the 2005 Preliminary Feasibility Report.

**FAIN AND GLOBAL SELECT UNDERWRITERS AND COUNSEL WHILE COSTS OF BOND ISSUANCE INCREASE TO $ 35 MILLION**

88.    By June 2005, the Fain Group and Global had selected Stern to be the lead underwriter and the Kutak Law Firm as bond counsel.  Stern retained Defendant Stinson as underwriter's counsel.  Baird later replaced Stern as lead underwriter.  Jones became the third underwriter because of its strong retail sales network.

89.    On August 11, 2005, the Authority granted preliminary approval to the issuance of the Bonds in the amount of no more than $35,000,000, an increase of $4 million from a previously expected $31 million issuance.  The increased cost put additional pressure on Global, Hocking, the Fain Group and the Town to demonstrate adequate revenues to support the issuance of the Bonds.

90.     Stern, as lead underwriter, anticipated purchasing the Bonds from the Authority as part of the initial public distribution of the Bonds and selling them to the investing public, with the assistance of the other underwriters, Baird and Jones, by means of the disclosure contained in the Official Statements.

91.     Underwriters are primarily responsible for drafting official statements and owe a duty to potential purchasers of the bonds they underwrite to have a reasonable basis for believing in the accuracy of the key representations of the issuer (in this case, the Authority) and, based upon that belief, to make full, fair and accurate disclosure in the official statements of all material facts potential purchasers of the bonds need to make fully informed investment decisions.

92.     As underwriters, Stern, Baird and Jones had a duty to review the 2001 Feasibility Report, the 2005 Preliminary Feasibility Report and either reviewed said reports and had actual knowledge of their contents or, deliberately and recklessly failed to review the reports.

93.     On November 1, 2005, following changes in the Development Agreement and other bond documents, the bond rating agency, Fitch, gave an "A-" investment grade rating to the $35 million bond issue.  Critical to the investment grade rating was Fitch's understanding and belief that payment of the Bonds was secured by a pledge of sales tax revenues:

> Within the entertainment district, 1% of the remaining 2% is reimbursed to the Developer of the entertainment district, FSG, for 25

years.  However, for the purpose of financing the facility, Developer has agreed to have this portion of TPT escrowed in an account held by a trustee for the purpose of paying debt service for as long as the bonds are outstanding.  In addition, the Town has agreed to have the remaining 1% generated within the district escrowed for debt service as well, also for a period of 25 years.

As alleged in more detail below, the Fitch rating was based on the same misleading information that was provided to Bondholders.

## THE OFFICIAL STATEMENTS OMITTED NUMEROUS STATEMENTS OF MATERIAL FACT

**The Official Statements Omitted Material Facts About the Decision to Terminate ERA.**

94.   Page 22 of the OS provides in pertinent part:

No feasibility report on the borrower and GEC's unaudited projected financial performance of the Project has been prepared and the unaudited projected financial performance of the Project has not been examined by any financial adviser or by any accounting firm in order to verify either the reasonableness of the assumptions used by the borrower and [Global], the appropriateness of the preparation and presentation of the unaudited projected financial performance of the Project or the conclusions contained in such unaudited projected financial performance of the Project.

95.   This statement was misleading.  It was misleading because it failed to disclose: (1) the belief of the Town, and S&Y that an independent Phase 3 Examination Report was necessary; (2) the original agreement to obtain a Phase 3 report; (3) the subsequent termination of ERA to prevent the wrongfully inflated projection from being independently analyzed; and (4) the withdrawal of S&Y as a result of the preceding events.

**The Official Statements Failed to Disclose Material Facts Contained in the 2005 Preliminary Feasibility Report that Indicated the Event Center Was Not Economically Feasible.**

96. The Official Statements are misleading because they fail to disclose the above alleged material facts contained in the 2001 Feasibility Report and the 2005 Preliminary Feasibility Report which would have cast significant doubt on the reasonableness of the projections in the Official Statements.

97. "APPENDIX C – ECONOMIC AND DEMOGRAPHIC INFORMATION CONCERNING THE TOWN AND MAP OF THE DISTRICT", contains several tables that address certain demographic features of Prescott Valley and the surrounding area but is misleading due to the failure to disclose any of the above-alleged material facts.

98. Appendix C, "TABLE NO. 5 – POPULATION STATISTICS" sets forth the population of Prescott Valley in ten year increments from 1960 through 2000 and reports an estimate for 2004 of 30,590 for the Town, 196,000 for Yavapai County and 5,833,685 for the state of Arizona. It is misleading because it reported the dramatic growth Prescott Valley had experienced, thereby creating the false impression that the population base in the market area for the Event Center was sufficient to generate the operating revenues and sales tax revenues needed to pay debt service on the Bonds, but failed to disclose the above alleged material

facts contained in the 2001 Feasibility Report and the 2005 Preliminary Feasibility Report.

99.     Appendix C to the Official Statements reports population statistics for Prescott Valley between 1960 and 2004, emphasizing the dramatic growth in population.  It is misleading because it fails to disclose the above-alleged material facts with respect to the thirty-two other municipalities with comparable event centers that have much larger populations and number of households.  These undisclosed facts were strongly indicative that the numbers of events and attendance projections in the Official Statements had no reasonable basis and could not be achieved.

**The Official Statements Failed to Disclose Projected Events Were Inflated from an Already Aggressive 97 to 100 Events per Year to 133 Events Per Year.**

100.   The entire "Estimated Revenue" section of the Official Statements (page 12 – 13) addresses projected revenues from sources such as "Public Use Recreation Revenues and Other Public Use Fees" and "Net Contractually Obligated Income" that are largely dependent on population and per capita income, but is misleading because it failed to disclose the above-alleged material facts contained in the 2001 Feasibility Report and the 2005 Preliminary Feasibility Report, which would have cast significant doubt on the reasonableness of the projections in the Official Statements.

101.   The "Event Revenues" sub-section of the "Estimated Revenue" section of the Official Statements (page 12) addresses projected revenues based on "the number of attendees to events at the Facility," "average annual total paid attendance" of approximately 480,000, Facility Fees, Ticket Surcharge and Facility Rental Fees and "based on approximately 133 events to be held at the Facility."

**The Official Statements Contain Actual and Projected Sales Taxes but Failed to Disclose the above alleged Material Facts Contained in the 2005 Preliminary Feasibility Report.**

102.   Table 2 to the Official Statements, captioned, "Actual and Projected Pledged Sales Taxes- Entertainment District and Secondary Credit Support Area" report actual sales tax revenues for 2001 through 2004 and projected sales tax revenues for the Entertainment District and Secondary Credit Support Area for 2005 through 2009.  The projected sales taxes for the Entertainment District were provided by the Fain Group.

103.   Table 2 to the Official Statements is misleading due to the failure to disclose the above-alleged material facts contained in the 2001 Feasibility Report and the 2005 Preliminary Feasibility Report which would have cast significant doubt on the reasonableness of these projections.

**The Official Statements are Misleading because they Projected the Event Center and Sales Tax Pledges would be Sufficient to Provide Two Times Debt Service Coverage.**

104.   Table 3 in the Official Statements is captioned "Estimated Pledged Revenues and Debt Service Coverage" and contains columns showing Project Net Operating Income, Project Sales Tax, Entertainment District Sales Tax, Secondary Credit Support Area, Total Estimated Pledged Revenues, Estimated Net Debt Service and Estimated Debt Service Coverage for the twenty-five year time period the Bonds would be outstanding.

105.   Table 3 in the Official Statements is misleading due to the failure to disclose the above-alleged material facts contained in the 2001 Feasibility Report and the 2005 Preliminary Feasibility Report which would have cast significant doubt on the reasonableness of this table.

**EACH OF THE DEFENDANTS EITHER KNOWINGLY OR RECKLESSLY  MADE THE MISLEADING STATEMENTS IN THE OFFICIAL STATEMENTS**

**The Defendants All Knew Any Fact that Indicated the Event Center Could Not Attract Sufficient Events or People to Attend Events Was Material and Must be Disclosed.**

106.   Each of the Defendants knew that any facts that would indicate to a potential Bond purchaser that the Event Center was not economically feasible or was not an investment grade bond would be material and must be disclosed in the Official Statements.

107.   Each of the Defendants knew the Official Statements were intended to create and did create the impression that the Event Center could reasonably be expected to attract a sufficient number of events and a sufficient number of people paying money to attend those events to generate the revenues projected in the Official Statements.

108.   Each of the Defendants knew that the ability of the Event Center to generate the revenues needed to justify an investment grade rating for the Bonds and to generate sufficient revenues to make debt service payments on the Bonds as they became due were largely dependent upon the population and number of households in the market area for the Event Center.

109.   As a result, each of the Defendants knew that any facts that indicated the population base in and around the Town was too small to support the projected number of events and attendance in the Official Statements would be material facts that must be disclosed in the Official Statements.

110.   Global, Hocking, the Town, PVEC, PVSE and Fain Group had actual knowledge that Global had substantially and wrongfully inflated the revenue, event and attendance figures in the Official Statements over the projections contained in the 2001 Feasibility Report and the 2005 Preliminary Feasibility Report because they each received and reviewed the 2001 Feasibility Report and the 2005 Preliminary Feasibility Report.

111.   Global, Hocking, the Town, PVEC, PVSE and Fain Group had actual knowledge that S&Y and the Town believed an independent analysis of the new inflated Global projections were required, that the agreement with ERA providing for a Phase 3 examination level report was terminated due to the belief that ERA would not approve the inflated projections and knew that the Town's independent financial advisor, S&Y, withdrew as a result of this decision because they all directly participated in these events.

112.   Despite the fact that it was not the issuer, the Town received and reviewed all drafts of the Official Statements and the final Official Statements.  As a result, the Town had actual knowledge that the Official Statements were misleading because of their failure to disclose material facts.

113.   As promoters of the Event Center that participated in every aspect of the issuance of the Bonds, Defendants Global, Hocking, the Town, PVEC, PVSE, and the Fain Group reviewed the Official Statements and knew that they were misleading for the above-alleged material facts and failures to disclose material fact in the Official Statements.

114.   The Kutak Law Firm has extensive experience acting as both underwriter's counsel and bond counsel in all manner of municipal bond offerings.

115.   The Stinson Law Firm has extensive experience acting as underwriter's counsel in municipal bond offerings.

116.   The Stinson Law Firm, as underwriter's counsel, and the Kutak Law Firm, as Bond counsel, owed a duty to purchasers of the Bonds to not approve the Official Statements for distribution to the investing public unless and until they were reasonably satisfied that the disclosure contained in the Official Statements was complete, accurate and was not misleading in any material respects.

117.   The Kutak Law Firm provided drafts of various bond offering documents to S&Y.  In an August 22, 2005 letter, S&Y made it clear to the Kutak Law Firm that it was no longer involved in the Project and attached a copy of its May 18, 2005 withdrawal letter.  As a result, the Kutak Law Firm was fully aware of the existence of the 2005 Preliminary Feasibility Report, was fully aware that Global, the Fain Group and the Town had terminated the agreement with ERA to provide a Phase 3 feasibility examination, was fully aware of the resulting withdrawal of S&Y and was fully aware that Global inflated the event attendance and revenue projections after terminating ERA.

118.   S&Y's August 22, 2005 letter with the attached May 18, 2005 withdrawal letter was provided to the Stinson Law Firm so it, too, was fully aware that Global, the Fain Group and the Town had terminated the agreement with ERA to provide a Phase 3 feasibility examination, was fully aware of the resulting withdrawal of S&Y and was fully aware that Global inflated the event attendance and revenue projections after terminating ERA.

119.  As the primary authors of the Official Statements, the Kutak Law Firm and the Stinson Law Firm made the above alleged representation on page 22 of the Official Statements that the unaudited projected financial performance of the project had not been examined by any financial advisor and had actual knowledge, based upon their receipt and review of S&Y's August 22, 2005 letter with the attached May 18, 2005 withdrawal letter that ERA had prepared a feasibility analysis for the Event Center that examined the unaudited projected financial performance of the Event Center for the purpose of determining the reasonableness of the underlying assumptions and the conclusions contained in the projections. The Kutak Law Firm and the Stinson Law Firm had actual knowledge that the above alleged paragraph in the Official Statement was misleading because of its failure to disclose material facts.

120.  As underwriter's counsel, the Stinson Law Firm knew and understood that its clients, Baird, Stern and Jones owed a duty to potential Bond purchasers to form a reasonable belief regarding the accuracy of the key representations contained in the Official Statements and to make full and fair disclosure of all material facts in the Official Statements so that potential Bond purchasers could make fully informed investment decisions.

121.  The Kutak Law Firm and the Stinson Law Firm, based upon their general knowledge of financial matters, their review of S&Y's August 22, 2005

letter with the attached May 18, 2005 withdrawal letter, their knowledge that Global, the Fain Group and the Town all believed that Phase 3 examination level feasibility analysis was required, their knowledge that the agreement with ERA to provide such an analysis was terminated, their knowledge that no such analysis was ever obtained, their knowledge that the cost of the Bond issue increased after the 2005 Preliminary Feasibility Report was prepared and their knowledge that projections had been materially changed after costs increased, knew that the 2005 Preliminary Feasibility Report contained material factual information and knew the Official Statements were misleading as a result of the failure to disclose such information.  Having such knowledge, the Kutak Law Firm and the Stinson Law Firm either reviewed the 2005 Preliminary Feasibility Report and had actual knowledge of the above alleged material facts contained in that report or, deliberately and intentionally failed to review the report.

122.  The Kutak Law Firm and the Stinson Law Firm owed a duty to purchasers of the Bonds not to issue any legal opinions, regardless of whether they were attached to the Official Statements, unless and until they were reasonably satisfied that the disclosure contained in the Official Statements was complete, accurate and was not misleading in any material respects.  Despite having knowledge that the Official Statements were misleading, the Kutak Law Firm issued two written opinions and the Stinson Law Firm issued one written opinion

and each firm knew that their opinions were conditions precedent to the successful issuance of the Bonds.

123.   Acting as bond counsel to the Authority, Kutak issued an opinion addressed to the Authority and the Trustee stating, among other things, that the Loan Agreement, the Trust Indenture and the Bonds were all "enforceable in accordance with their terms."  An unsigned version of this opinion was attached to the Official Statements with the knowledge and consent of the Kutak Law Firm so that potential purchasers of the Bonds could rely upon it.

124.   The Kutak Law Firm issued an opinion addressed to the underwriters and to the Stinson Law Firm opining, among other things, that the "Introduction", "Description of the Bonds", "Security for the Bonds", "Appendix D – Form of Trust Indenture", "Appendix E – Form of Opinion of Bond Counsel" and "Appendix G – Form of Deposit Only Account Agreement" contained "fair and accurate statements with respect to the information contained therein."

125.   The Stinson Law Firm issued an opinion addressed to the underwriter acknowledging that it had read, among other documents, the Loan Agreements, Indenture and Official Statements.  The Stinson Law Firm negligently opined that:

> "Subject to the foregoing limitations with respect to our engagement, no information was disclosed to us in connection with our conferences or conversations regarding the Official Statement referred to above which has caused us to believe that the Official Statement (except with respect to any financial or other statistical data or forecasts and information about DTC), as of the date thereof, contained any untrue

statement of a material fact or omitted to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading."

126.   For the above-alleged reasons, the Stinson Law Firm and the Kutak Law Firm did not have any good faith belief that the above-stated opinions were accurate.

### The Underwriters Acted with Deliberate Recklessness.

127.   Baird, Stern and Jones knew that, by acting as underwriters and by approving the Official Statements, they were representing to the investing public that, to the best of their knowledge, information and belief, the Official Statements contained full and fair disclosure of all material facts and did not contain any false or misleading statements of material fact.

128.   Baird, Stern and Jones, and the other participants in the underwriting process,  participated in the process of drafting the Official Statements, reviewed drafts of all certificates and opinions provided in connection with the issuance of the Bonds and knew that no participant in the underwriting process represented that it took responsibility for the accuracy and completeness of disclosure regarding the economic feasibility of the Event Center in the Official Statements. As a result, Baird, Stern and Jones knew that they could not reasonably rely upon any other participant in the underwriting process.

129.   Baird, Stern and Jones were informed by their counsel, the Stinson Law Firm, of the circumstances under which S&Y withdrew.  As a result, Baird, Stern and Jones knew of the existence of the 2005 Preliminary Feasibility Report and knew that Global, Hocking, the Town and the Fain Group had been evaluating the economic feasibility of the Event Center for some time prior to the Development Agreement.

130.   Baird, Stern and Jones knew that the 2005 Preliminary Feasibility Report could contain material factual information regarding the economic feasibility of the Event Center that should be disclosed in the Official Statements.

131.   Baird, Stern and Jones also knew the cost of the Bond issue had increased substantially since the 2005 Preliminary Feasibility Report was prepared and knew that revenue projections for the Event Center had been materially changed as a result.

132.   As authors of the Official Statements, Baird, Stern and Jones made the above alleged representation on page 22 of the Official Statements that the unaudited financial performance of the Event Center had not been examined by any financial advisor to determine the reasonableness of the assumptions and conclusions contained therein.  Baird Stern and Jones had actual knowledge that the above alleged paragraph in the Official Statements was misleading due to the failure to disclose all material facts.

133. Baird, Stern and Jones also knew that they could not form a reasonable basis for believing in the economic feasibility of the Event Center until they reviewed the records of PVEC, Global, the Fain Group and the Town. The 2001 Feasibility Report and the 2005 Preliminary Feasibility Report were contained among the records of the Town, Global, PVEC and the Fain Group.

134. Baird, Stern and Jones either reviewed the records of the Town, PVEC, the Fain Group and Global and reviewed the 2001 Feasibility Report and the 2005 Preliminary Feasibility Report contained therein or knowingly failed to conduct any such due diligence inquiry and knew that they had no idea whether the Official Statements made full and fair disclosure of all material facts or were, instead, misleading.

**THE AUTHORITY ACTED RECKLESSLY WITH RESPECT TO THE ISSUANCE AND OFFERING OF THE BONDS**

135. As the issuer of the Bonds, the Authority made all the representations in the Official Statements and owed a duty to bond purchasers to take reasonable steps to ensure that the Official Statements contained full and fair disclosure of all material facts and did not make any false or misleading statements of material fact.

136. The records of the Town, PVEC, Global and the Fain Group, including the 2001 Feasibility Report, the 2005 Preliminary Feasibility Report and correspondence from S&Y were available to the Authority. The Authority recklessly failed to review the 2001 Feasibility Report and the 2005 Preliminary

Feasibility Report and to ensure that the Official Statements disclosed all material facts.

### DEFENDANTS, GLOBAL, KOZUBACK, TRELIVING, PVSE AND FAIN GROUP ARE CONTROLLING PERSONS

137.   The officers and board of directors of Global, including Defendants Kozuback and Treliving, directly and indirectly controlled all of the actions of Global and PVEC and owed a duty to bond purchasers to take reasonable steps to ensure that the Official Statements contained full and fair disclosure of all material facts and did not make any misleading statements of material fact.

138.   Defendant PVSE, as a manager of PVEC, directly and indirectly controlled all of the actions of Defendants PVEC and owed a duty to bond purchasers to take reasonable steps to ensure that the Official Statements contained full and fair disclosure of all material facts.

139.   Defendant Fain Group, as the manager of Defendant PVEC, directly and indirectly controlled all of the actions of Defendants PVSE and PVEC and owed a duty to bond purchasers to take reasonable steps to ensure that the Official Statements contained full and fair disclosure of all material facts.

### THE BONDS WERE ISSUED IN NOVEMBER 2005 AND WERE PURCHASED BY PLAINTIFFS AND THE CLASS IN RELIANCE UPON THE MISLEADING OFFICIAL STATEMENTS

140.   The Preliminary Official Statement was dated November 4, 2005 and was provided to potential Bond purchasers by the underwriters.   The Official

Statement was dated November 22, 2005 and was provided to potential Bond purchasers by the underwriters in November 2005.

141. Plaintiffs and the Class purchased Bonds in reasonable reliance upon the Official Statements that were prepared and issued on behalf of the Authority in Arizona in the months following November 2005. Plaintiffs would not have purchased the Bonds if they had not received an investment grade rating.

142. The Bonds were issued with $3,167,434.95 in capitalized interest that would be used to pay interest on the Bonds while the Event Center was being constructed.

143. Capitalized interest was used to make the April 2006, October 2006 and April 2007 interest payments on the Bonds.

144. The Event Center was under construction from November 2005 until late 2006 and began operations in about late 2006.

145. The Trustee determined that it had not yet received revenues and made application to the Town on September 20, 2007.

146. No payments of sales tax revenues were made by the Town in response to the application. The Trustee was forced to pay the October 1, 2007 debt service payment from the debt service reserve fund.

147. The Trustee issued a pre-default demand notice to the Fain Group, Global, the Town and PVEC on January 18, 2008 due to their failure to remit the

October 1, 2007 debt service payment and breach of other covenants in the bond documents. The Trustee sent a carbon copy of the pre-default letter to the Authority.

148.   On April 18, 2008, the Trustee issued a Notice addressed to all Bondholders, with copies sent to the Town, the Authority, Global, PVEC and the Fain Group, declaring that there had been events of defaults  under the bond documents due to the failure of  PVEC to pay the October 1, 2007 debt service payments and other defaults.

149.   Fitch Rating obtained a copy of the Trustee's April 18 2008 Notice and spoke with the Trustee on May 23, 2008 concerning the defaults reported in the Notice.

150.   On May 30, 2008 Fitch Ratings downgraded the Bonds to junk status. Fitch downgraded the bonds because of the Trustee's declaration of events of default, and concerns with declining TPT Revenues in Prescott Valley and the inability of the Event Center to generate any pledged net income that would contribute to debt service payments.  Following this downgrade to junk status, the bonds have been very thinly traded for pennies on the dollar. The drop in value of the Bonds was the direct result of the Fitch Ratings' downgrade. The downgrade was  based upon  Fitch's realization that the Bonds did not have sufficient net cash flows to qualify for an investment grade rating, including concerns about the lack

of security for the bonds. Defendants' omissions of material fact in the Official Statements concealed the fact that the Bonds  never truly qualified as investment grade securities, and thereby substantially caused damages to Plaintiffs and the Class,  who purchased the bonds at a price commensurate with an investment grade rating.

151.   Plaintiffs did not have reason to believe they had been defrauded until 2009, when the material omissions in the Official Statements came to light through production by the Town of Prescott Valley of its internal records relating to the transaction.

152.   As a direct and proximate result of the small population of Prescott Valley and the surrounding market area for the Event Center compared to comparable event centers, the Event Center was not able to generate any net operating income to pay debt service (much less the $1.6 million that was projected in the Official Statements).   As a result, the Event Center generated minimal sales tax revenues and sales tax revenues from the Entertainment District fell far short of projections.  The actual financial performance of the Event Center was remarkably close to what was projected in the 2001 Feasibility Report that was concealed from Bond purchasers.

153.  As a direct and proximate result of the wrongful conduct of Defendants, and each of them, Plaintiffs and the Class seek to rescind their

purchases of the Bonds and, in the alternative, seek out-of-pocket damages in an amount which is presently unknown.

**FIRST CLAIM FOR RELIEF**
**(Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5**
**Promulgated Thereunder Asserted Against Baird, Stern, the Town, Global,**
**Hocking, Hocking Associates, PVEC, PVSE and the Fain Group**
**the Kukak Law Firm and the Stinson Law Firm)**

154.  Plaintiffs and the Class repeat the allegations of all preceding paragraphs of the Complaint and incorporate the same by reference.

155.  Baird, Stern, Jones, the Town, the Authority, Global, Hocking, Hocking Associates, PVEC, PVSE, the Fain Group, the Kukak Law Firm and the Stinson Law Firm, directly and indirectly, singly and in concert, in connection with the offerings and sales of the Bonds to Plaintiffs and the Class, recklessly, knowingly and/or with an intention to defraud, failed to disclose material facts, which material facts were necessary in order to make the statements made in connection with those offerings and sales not misleading in light of the circumstances under which those statements were made all in violation of Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

156.  The Official Statements and the appendices thereto were the principal selling documents for the Bonds and were specifically intended and designed for the benefit and guidance of prospective investors, such as Plaintiffs and the Class.

The above-named Defendants all knew that investors would rely on the information contained in the Official Statements when deciding whether or not to purchase the Bonds.

157.   Plaintiffs, either directly or acting through their authorized brokers, reasonably relied upon the Official Statements.

158.   The purpose, effect and result of the violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 by the above-named Defendants was to induce Plaintiffs and the Class to purchase the Bonds, something they would not otherwise have done.

159.   As a direct and proximate result of the hereinabove-alleged violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder, Plaintiffs and the Class have suffered damages.

**SECOND CLAIM FOR RELIEF**
**(Section 20(a) of the Securities Exchange Act of 1934,**
**Asserted Against PVSE, the FAIN GROUP, Global, Kozuback and Treliving)**

160.   Plaintiffs and the Class repeat the allegations of all preceding paragraphs of the Complaint and incorporate the same by reference.

161.   PVSE, Fain Group and Global directly or indirectly controlled the above alleged activities of PVEC that constitute violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 within the meaning of Section 20(a) of the Securities Exchange Act of 1934 [15 U.S.C. § 78t(a)].

162.   Defendants Kozuback and Treliving directly or indirectly controlled the above alleged activities of Global and PVEC that constitute violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 within the meaning of Section 20(a) of the Securities Exchange Act of 1934 [15 U.S.C. § 78t(a)].

163.   As a direct and proximate result of the above-alleged violations of Section 20(a) of the Securities Exchange Act of 1934, Plaintiffs and the Class have suffered damages.

### RELIEF REQUESTED

Plaintiffs and the Class request that the Court enter judgment in their favor, and against the Defendants, and each of them, jointly and severally, on each of their Claims for Relief and award Plaintiffs and the Class:

A.   Statutory damages or rescission;

B.   In the alternative, out-of-pocket damages;

C.   Prejudgment interest;

D.   Costs;

E.   Attorneys' fees as allowed by law; and

F.   Any other relief which the Court deems proper.

### DEMAND FOR JURY TRIAL

Plaintiffs and the Class hereby demand a jury trial with respect to their Complaint.

1

2

3                                        Respectfully submitted,

4    Dated:  September 30, 2009          **MASLON EDELMAN BORMAN &**
                                         **BRAND, LLP**
5

6

7                                        By:     /s/ Alain M. Baudry
8                                                Alain M. Baudry (MN #186685)
9                                                Jonathan S. Parritz (MN #177581)
                                                 3300 Wells Fargo Center
10                                               90 South Seventh Street
11                                               Minneapolis, MN 55402
                                                 Telephone:  612-672-8200
12                                               Facsimile:   612-672-8397
13                                               E-mail:      alain.baudry@maslon.com
                                                              jon.parritz@maslon.com
14                                                            paul.civello@maslom.com
15                                       **-and-**

16                                       **LAVELLE & LAVELLE**
17                                       Michael J. LaVelle
18                                       Camelback Esplande II Center - Suite 888
                                         2525 East Camelback Road
19                                       Phoenix, AZ 85016-4280
20                                       Telephone:  602-279-2100
21                                       Facsimile:   602-279-2114
                                         E-mail:        mjl@lavelle-lavelle.com
22                                                      matt@lavelle-lavelle.com
23
                                         **ATTORNEYS FOR PLAINTIFFS**
24

25

26

27

28